2022 IL App (1st) 192224-U

THIRD DIVISION
September 21, 2022

No. 1-19-2224

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 2647702 |
| | ) | |
| HULON VERSER, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err by denying the defendant's postconviction petition after a third stage evidentiary hearing.

¶ 2    Following a jury trial, defendant, Hulon Verser, was convicted of two counts of murder and two counts of aggravated kidnapping in connection with the 1993 kidnappings and murders of the victims, fifteen-year-old Stanton Burch and eighteen-year-old Michael Purham. Defendant was sentenced to natural life imprisonment. This appeal arises from the dismissal of defendant's postconviction petition following a third-stage evidentiary hearing.

¶ 3     The record shows that prior to trial, defendant filed two motions to suppress. The first motion to suppress was based on a lack of probable cause. At the hearing on the first motion, the State called Gang Specialist Michael Cronin and Officer James Norris. Cronin testified that on September 14, 1993, Chicago police had an ongoing investigation into a violent "power struggle" between two factions of the Unknown Vice Lords street gang. One faction was led by Tyrone Williams, the other by Willie Lloyd. The conflict had led to several shootings, some of them deadly, and to the suspected kidnapping and murders of Burch and Purham, who had been reported missing the previous day. On September 13, 1993, a confidential informant previously found to be reliable had told Cronin that Williams would be attending a funeral for a gang member who had been murdered several days earlier and would have armed gang members with him "acting as security." Cronin also received information that Lloyd and several people loyal to him might be attending the funeral. Cronin set up surveillance at the Branch Funeral home, and at approximately 8 p.m. he saw ten to fifteen men wearing hooded sweatshirts with the hoods up enter the funeral home together. The men left a short time later, and Cronin recognized one of them as Williams. As the men began walking northbound across Roosevelt Road toward Troy Street, Cronin notified other officers by radio, and the officers arrested defendant and Derrick Harvey.

¶ 4     Norris testified that on the evening September 14, 1993, he was parked in a lot near the funeral home and was in radio communication with Cronin, who had information that Williams and gang members loyal to him would be attending a funeral and carrying guns. Around 8 p.m., Cronin radioed that a group of men wearing dark hooded sweatshirts had entered the funeral home and that he believed Williams was with them. Shortly thereafter, Cronin radioed that Williams had left the funeral home with the men wearing dark hooded sweatshirts. Norris left the

2

lot and drove to the funeral home, where he saw four men enter an Oldsmobile parked on the west side of Troy and a van pulling away northbound on Troy. Norris stopped the van and ordered the occupants to put their hands up and stay in the vehicle. He then looked over his shoulder to where other officers were located and saw defendant, who was wearing a dark hooded sweatshirt, running toward him. Norris identified himself as a police officer and ordered defendant to stop, but defendant "continued running across the street and toward *** the north alley of Roosevelt." Norris chased defendant into the alley, where defendant ducked behind a dumpster. Norris ordered defendant to stop and show his hands, and defendant complied. Norris then recovered a 9-millimeter handgun from defendant's waistband and placed him under arrest.

¶ 5    On cross-examination, defense counsel elicited testimony that Norris did not see defendant in the van or with Williams, and that Norris did not see a weapon on defendant prior to the search.

¶ 6    Defendant did not testify and called no witnesses at the hearing, but stipulated that he gave oral and written statements and that the gun Norris recovered was his.

¶ 7    In closing, defense counsel asked the court to suppress defendant's statements and the gun found during his arrest because Officer Norris lacked probable cause to arrest him. Defense counsel argued that he was not in either of the vehicles, and that Officer Norris did not know where defendant "came from before the arrest." Defense counsel asserted that defendant was arrested "because he was running across the street.  And if that is probable cause, Your Honor, then – I do not believe it's probable cause."

¶ 8    The trial court denied the suppression motion, finding that defendant's arrest was based on probable cause:

"[T]he information gained by the officers *** that was part of their knowledge at the time of the stops, chases and recovery of the weapons [was] that there was *** a funeral being held of a Vice Lord Gang Member; that at the funeral there were going to be rival fa[ct]ions of the Vice Lord Gang ***; that one of the leaders of the Vice Lords at the time, Mr. Willie Lloyd, *** would be there; and another leader at the time of [a] rival fa[ct]ion was a Mr. Tyrone Williams, also known as Baby Ty Williams.

*** [T]hose individuals would be armed, especially and including the people that would be accompanying Mr. Williams ***.

The officers then *** conducted a surveillance. First, they saw the individuals going in and exiting [the funeral home], splitting into two groups; one portion to a van, and the other portion to an Oldsmobile parked to drive away.

It's clear at the time of the stop for [defendant], when the van was stopped, Officer Norris testified that he saw the defendant *** running toward him. But more important than that, away from the area in which the other officers had been.

At this time I believe the officer acted reasonably in ordering the defendant to stop. When he didn't, [Norris] pursued the defendant into an alley. When [Norris] pursued the defendant into an alley, he saw the defendant crouch down and try to hide from him behind a dumpster. I think that would certainly give this officer reasonable suspicion to pursue his investigation even further.

But based on the fact that the defendant was dressed in the manner of these other individuals, and the fact that these other individuals had been in the company of Mr. Tyrone Williams, and also based on the fact that he had ***

4

reasonable belief based on *** information from a reliable confidential informant, that this person may be armed and dangerous, at that point he testified he conducted a protective pat-down search, and pursuant to that search, he found a .9 millimeter weapon in the defendant's waistband.

In the totality of the circumstances *** the officers acted reasonably.

The motion to suppress will be denied. "

¶ 9     The court then noted that there was another motion to suppress defendant's statements, which defense counsel explained was based on "*Miranda*," and the court scheduled that motion for hearing.

¶ 10     The second suppression motion was heard on March 1, 1996. At that hearing, Christin Kato, a Chicago Police Detective, testified that he first spoke with defendant at about 1:30 a.m., September 15, 1993. The conversation occurred in an interview room at the Area 4 police station. Kato stated that defendant was advised of his rights and defendant indicated he understood them. At that time, Kato said he and defendant had a conversation regarding the deaths of Burch and Purham.

¶ 11     At approximately 4 a.m. Assistant State's Attorney James Nelson, a Felony Review Assistant, arrived. Kato said that Nelson read defendant his rights and informed him that he was an attorney for the State. Kato stated that Nelson held another conversation with defendant concerning the shooting of Burch and Purham. At the end of that conversation, Kato said that defendant chose to give a handwritten statement. Kato further stated that defendant was able to review the statement by reading it aloud and that he was able to make corrections. According to Kato, defendant also initialed the corrected portions of the statement and signed it.

¶ 12    Defendant testified at the suppression hearing that he was interviewed by Officer Cronin who physically threatened him by putting his foot on a chair between defendant's legs. According to defendant, Cronin also threatened him by talking about what would happen to him and his family if he were found guilty. He also stated that Detective Kato was never present. Defendant further testified that he did not remember talking to Nelson, but there was a man in the room writing things down. He said that he did not tell the man in the room anything about the shootings. Defendant also claimed that the man never read the statement aloud to him and that the initials on the document were not his.

¶ 13    In rebuttal, the State recalled Nelson, Detective Kato, and Officer Cronin. Nelson testified that he read defendant his *Miranda* rights and told defendant he was an attorney working with the police. Nelson had defendant review the statement and allowed him to make changes to it. Nelson said that he, Detective Kato, and defendant all initialed the statement. Nelson also testified that Officer Cronin was not present at any time during defendant's interview. Detective Kato testified that he was present for defendant's statement and that Officer Cronin was not involved in the interview. Officer Cronin testified that he never conversed with defendant in regard to the shootings and that he did not sit in on any statements given.

¶ 14    Defense counsel argued that the court should suppress his statement because defendant testified that he was not given *Miranda* warnings, and that he was "promised *** leniency."

¶ 15    The court initially noted that it was a "matter of credibility" and that there was "no evidence to support" defendant's claims that he was not advised of his *Miranda* rights, that he did not understand those rights, or that he was threatened or promised leniency. To the contrary, the trial court noted that the State's witnesses testified that he was advised of his *Miranda* rights, there was evidence that defendant signed a statement indicating that he was read and understood

those rights. "As a matter of credibility" the court found that there were no promises of leniency made to defendant, and no threats or coercion. Accordingly, the court denied defendant's second motion to suppress.

¶ 16    The evidence presented at defendant's subsequent trial was extensively set out in the Rule 23 order entered in defendant's direct appeal. *People v. Verser*, No. 1-98-1779 (2002) (unpublished order under Supreme Court Rule 23). Because that evidence is relevant to this appeal, we repeat it below:

"At trial, Nelson testified again that defendant was advised of his rights. Nelson said that defendant acknowledged that he understood those rights. Nelson also stated that he discussed the shooting with defendant. According to Nelson, defendant elected to have a written statement prepared by him which would memorialize the events and would allow defendant to review the document and make changes. Nelson further testified that defendant read the statement aloud, made two corrections, and signed each page on the bottom.

Defendant's statement was then read to the jury. Among other things, the statement indicated that it was taken, 'regarding the fatal shooting of Stanton Burch and Michael Purham which occurred September 13, 1993, at 2501 West Roosevelt at 2:00 p.m.' In it, defendant admitted that he was a member of the Unknown Vice Lords and that he occasionally sold drugs for Ted (Artez Thigpen) at the 'spot' located on Springfield Street between Fillmore and Arlington Street in Chicago. Defendant also acknowledged a battle between Ted Thigpen and Willie Lloyd over which faction controlled drug sales at the spot. Specifically, defendant stated that on September 12, 1993, a man selling drugs for Ted was

robbed of drugs by Willie Lloyd and twelve of his men.

Defendant also said that Ted instructed him to get a gun and that he, Ted, and eight other men got guns and went out looking for Willie Lloyd and his gang. Defendant indicated that Ted promised defendant that if he helped him protect his spot, defendant would get a spot of his own to sell drugs.

The next morning, defendant stated that they all got up and took their guns with them. Defendant testified that Ted and Tyrone Williams informed him that two of Willie's boys were selling drugs at Ted's spot, and said, 'let's go get 'em.' Ted and Tyrone left in a car and defendant stated that he and the rest of the men ran over to the spot. When he arrived, defendant said that Ted and Tyrone already had the two men in the back of a car. He also stated that he knew Ted was going to kill them. The two men in the back of the car were Burch and Purham.

These men were taken to an elevated spot between the railroad tracks on Roosevelt Street between Western Avenue and California Avenue. Defendant said that Ted shot one of the guys in the head. He then admitted that he and the other guys began shooting at the victim who had not yet been shot. Defendant believed he shot this man in the leg. Defendant further admitted that the gun found on him at the time of his arrest was the same gun he used to shoot one of Willie's boys.

Barry Williams, also known as 'Smurf' and Aaron Lamar, testified that he was at the spot at the time, Burch and Purham were taken off the street. He stated that he did not remember defendant being present at the scene. However, Williams previously gave a statement to Assistant State's Attorney Nelson on September 16, 1993.

8

In that statement, Williams said that he was an Unknown Vice Lord who sold drugs for Ted at Ted's spot. He also stated that he was at Ted's spot on September 13, 1993, when two black males arrived in a car and announced that Willie Lloyd was taking over the spot from Ted. The two guys began selling drugs. Ted drove by in a car and drove off without saying anything. After about ten minutes, Ted returned with approximately 10 other guys, most of whom had guns in their hands. Williams said that defendant was among the group that returned with Ted.

Assistant State's Attorney William Fahy testified that Williams had also appeared before the grand jury in connection with these shootings. In his grand jury testimony, Williams said that defendant was an Unknown Vice Lord who approached the spot carrying a weapon at the time the victims were taken off the street.

Thomas Pack, an investigator for the Cook County State's Attorney's office, stated that on January 14, 1998, he received a request to locate Williams. According to Pack, he found Williams in an apartment on the west side of Chicago and tried to serve him with a subpoena in connection with this case. Williams admitted that he did not want to be served and he said that if he testified, 'he's dead and so is everybody else in the building.'

At trial, Officer James Norris's testimony was similar to his testimony given at the suppression hearing. He stated that on September 14, 1993, he chased defendant into an alley and recovered a .9 millimeter semi automatic handgun from defendant's waist band.

James Pubins, a Chicago Police Detective, testified that he found the victims' bodies just off an embankment of the railroad tracks located on Roosevelt Road, about a block west of Western Avenue. A bullet was found in Stanton Burch's clothing.

The parties stipulated that if Robert Fournier, a Firearm's Examiner for the City of Chicago Crime Lab, were called to testify, he would state that the .9 millimeter hand gun found on defendant could have fired the .9 millimeter bullet recovered from the clothing of Stanton Burch.

Defendant testified that he had known Ted for a long time and was Ted's friend. He acknowledged that Ted was allied with Tyrone Williams. He also said that, at the time of the shooting, he was a member of the Unknown Vice Lords and that he was at a funeral home on the evening of September 14, 1993. He admitted that there were other gang members at the funeral and that he was wearing a dark hooded sweatshirt.

Prior to his arrest, defendant said that he was standing by the corner store on Roosevelt Road and Troy Street when Officer Norris drove up and stopped the car. According to defendant, Norris saw a mini van and he and his partner got out of their vehicle. The arrival of the police caused many people to flee. Defendant stated that he did not run, but was arrested by Norris. He admitted that Norris found a weapon on his person at the time of his arrest and that the gun was a fully loaded .9 millimeter weapon. Defendant denied that it had the name Vice Lords inscribed on the handle. He said that he was carrying the gun for his protection because of the on-going fight within the Vice Lords.

Defendant admitted that he was taken to the second floor of the police station by Detective Kato after Officer Norris had questioned him. He said that he did not give a statement to Detective Kato concerning the shootings of Burch and Purham. Defendant also stated that Assistant State's Attorney Nelson came into the room. According to defendant, Nelson never read him his rights. Defendant denied that he gave a statement to Nelson concerning the shootings. While in the room, he said that Nelson was writing things down on a sheet of paper. Defendant testified that he never told Nelson that he shot at one of the victims or that the .9 millimeter found on his person was used in the shooting. Defendant admitted to signing and initialing the statement prepared by Nelson. However, defendant claimed that he signed the statement because Nelson told him that if he signed it he could leave.

Later in his testimony, defendant stated that he knew both Detective Cronin and Detective Kato. He said that it was Defective Cronin who brought him to the interview room, not Detective Kato. According to defendant, he had no dealings with Detective Kato at all that day. Defendant admitted that Detective Kato's signature was on the statement.

Defendant further testified that he was sure Detective Cronin was the detective who questioned him about the shootings. He said Cronin put his feet on a chair between his legs and said that if defendant did not cooperate he was going to hook him up on the case. Detective Cronin told him to tell the assistant State's Attorney that he shot Stanton Burch in the leg.

In rebuttal, the State called Officer Cronin who stated that he never spoke

11

with defendant on the day he was arrested. The State then called Detective Kato who testified that he interviewed defendant and that Officer Cronin did not have any contact with him.

At the end of trial, the jury found defendant guilty of two counts of first degree murder and two counts of aggravated kidnapping. Defendant was sentenced to natural life imprisonment on the first degree murder convictions." *Id.*

¶ 17 On direct appeal, defendant argued that the trial court erred in denying his motion to suppress statements based on defendant's claim that his statements were involuntary. This court concluded that the "totality of the circumstances indicate[d] that defendant's confession was voluntary," and that the only evidence weighing against the statement's admission was defendant's testimony, which the trial court did not find credible. *Id.* at 12-16. We also rejected defendant's argument that the court abused its discretion in admitting "other crimes evidence" that he was arrested "in the company of armed gang members," and his related ineffective assistance claim based on trial counsel's failure to object to said evidence. We concluded that the evidence was "admissible to demonstrate the existence of a gang war and defendant's motive to harm those members of the rival faction." *Id.* at 18, citing *People v. Smith*, 141 Ill. 2d 40, 58 (1991) ("[E]vidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act.").

¶ 18 Thereafter, in May 2002, defendant filed a *pro se* petition under the Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.*, which he later supplemented. In his *pro se* petitions, defendant argued, among other things, that the court abused its discretion in admitting funeral home surveillance footage and "permit[ting] the jury to view the weapons recovered from a car

outside the funeral home," and that his counsel was ineffective for failing to object to this evidence. Defendant also argued that it was "plain error" for the court to not "instruct the jury that the State must prove beyond a reas[o]nable doubt that [defendant] was 'legally responsible' for the acts of his co-defendants." Finally, defendant asserted that the trial court "abused its discretion in denying the defense motion to sup[p]ress the arrest and [defendant]'s statement taken from him. [Defendant] was not committing any crime when he was arrested. He was minding his own business, standing on a street corner and watching the drama of the police stopping a minivan down the street from where he was at. When the people from the minivan fled, police arrested the [defendant]." Defendant alleged that he was arrested "illegally and then tricked *** into signing a false confession."

¶ 19    Defendant was appointed counsel on his *pro se* postconviction petitions who filed an amended petitions in April 2009. In the amended petition defendant argued, among other things, that "trial and appellate counsel were ineffective for failing to raise the issue that the court erred in denying the motion to suppress evidence." Defendant argued that the testimony showed that "no one saw where [defendant] came from, and no one was certain that [defendant] was armed." Defendant asserted that he "simply was in the vicinity of others whom the police were seeking," and that trial counsel "was ineffective for failing to argue that running from an officer, which [defendant] vehemently denies he did, equates [*sic*] to probable cause to stop and arrest." He further alleged that "[c]ounsel on appeal was also ineffective in this regard."

¶ 20    Meanwhile, in 2008, while in prison for an unrelated offense, another member of the Vice Lords gang, Corey Campbell, told his cellmate that he was involved in the kidnapping and murders of the victims. Campbell's cellmate wore a wire and recorded Campbell admitting his involvement. When investigators later conducted a videorecorded interview of Campbell in

prison, Campbell used a fake name and initially insisted that he was not involved. Campbell later admitted to assisting in the abduction of the victims, but claimed that he was not carrying a gun and that he did not take the victims to the railroad tracks or shoot them. Campbell later pleaded guilty to the murder and aggravated kidnapping of one of the victims, and was sentenced to 70 years' imprisonment.

¶ 21    Defendant, through counsel, then filed a second amended petition for postconviction relief in February 2012. That second amended petition, which is the subject of this appeal, raised a claim of actual innocence primarily based on an affidavit from Campbell. Campbell generally took responsibility for the offenses and stated that defendant was not present when they were committed. Specifically, Campbell averred that on September 13, 1993, he, Derrick Harvey and Lil-Donny pulled up on "Springfield and Arthington" where "Eunice and two unknown" males were "standing out on our block" selling drugs. Campbell stated that he, Harvey and Lil-Donny got out of the car and grabbed the two males, put them in the back seat of the car, and drove off. Campbell averred that defendant "was not on the street" at that time. Campbell further stated that he, Harvey and Lil-Donny asked the two males "who were they selling for," and they responded that they "were selling drug[ ]s for Willie Lloyd." Campbell, Harvey and Lil-Donny then "took the drug[ ]s from" the two males, and took them to the railroad tracks. Campbell stated that Lil-Donny forced the two males to get on their knees, and Campbell, Harvey and Lil-Donny "shot and killed" them. Defendant "was not with" them when they killed the victims. Campbell further stated that "Derrick Harvey used [defendant's] name to free himself of the crime. [Defendant] is innocent, convicted for a murder he did not commit[ ]."

¶ 22    Defendant also attached affidavits from Eunice Clark and Terrell Hills.

¶ 23    Clark averred that she was a witness to "the incidents that resulted in the deaths of" the victims, and that she testified at "some of the trials," but not defendant's trial. Clark stated that in 1993, she was the girlfriend of Williams, who had testified at defendant's trial. On September 13, 1993, she was standing with Williams near Springfield and Arthington, waiting for "Ted" to bring them drugs to sell. Clark then saw the victims, who told them that "this was not Ted's spot anymore.  It belonged to Willie Lloyd." Ted and another man arrived and told the victims to get in the car.  A group of men "approached the corner from the other direction of the railroad tracks." Clark stated that at other trials, she "named names" of people who she saw in this group, but she never saw, or testified that she saw, defendant. Clark further stated that she was "told by gang[ ]members loyal to Willie Lloyd" that she had to "testify and name certain names that Willie Lloyd wanted out of the way." Clark "knew" that Williams was "told the same thing," and she was "aware that [Williams] gave untruthful testimony in an attempt to scam the State's attorney for money that we later used to purchase drugs." Clark averred that she was "coming forward now because Willie Lloyd has lost a lot of his power and [she] fe[lt] bad that [defendant] has been convicted of a crime he didn't commit."

¶ 24    Hills averred that on September 14, 1993, he was standing across from the funeral home. He saw defendant enter the funeral home alone, and then exit alone about five minutes later. Hills then saw defendant enter a convenience store. While defendant was in the convenience store, Hills saw two cars pull up to the funeral home, and about eight men exited the vehicles and entered the funeral home. Defendant then exited the convenience store, carrying a small bag. Defendant greeted Hills, and they "entered into a conversation." About 10-15 minutes later, the eight men exited the funeral home and returned to their cars.  At that time, multiple police cars began to pull up. The police attempted to arrest the men, and Hills saw one officer arrest

defendant. Hills stated that defendant was not with the eight men, and defendant did not run from police. Hills further stated that his "fear of retaliation" prevented him from "coming forward earlier."

¶ 25    Defendant also alleged several other claims, including, among others, a *Batson* violation, that he was denied effective assistance based on trial counsel's failure to object to the introduction of weapons and funeral home surveillance, and that the court abused its discretion in "not instructing the jury that the State must prove that [defendant] was 'legally responsible' for the acts of his co-defendant." Those claims are not at issue in this appeal.

¶ 26    An evidentiary hearing was held in 2019. At the outset of the hearing, defendant's counsel noted that defendant's case had been investigated by the Conviction Integrity Unit of the State's Attorney's Office for "close to three years" and that the defense was "not going forward on" an affidavit from Clark "[b]ased on an interview conducted by the conviction integrity unit."

¶ 27    At the hearing, defendant called only Campbell. Campbell testified that he was currently incarcerated at Pickneyville for a "double murder." Campbell testified that he pleaded guilty in August 2011 to the 1993 aggravated kidnapping and murder of the victims. Campbell testified that only three people—himself, Derrick Harvey, and Donald "Lil-Donny" Blakely—were involved in the offenses. Campbell testified that defendant had "nothing to do" with the crimes, and that he was not present when the offense occurred. Campbell speculated that Harvey implicated defendant to get a lower sentence.

¶ 28    Campbell testified that he was previously housed at Menard Correctional Center and that defendant was there at the same time. Campbell testified that he provided an affidavit to defendant after defendant approached him in the commissary at Menard Correctional Center.

Defendant told Campbell that he was in prison for "something [he] didn't do" and he "needed [Campbell's] help" to "sign an affidavit proving that he wasn't involved in the crime."

¶ 29    Campbell denied that he was associated with Thigpen, that Thigpen ran the drug spot, and that Thigpen was involved in the crimes. He also denied any knowledge of a gang war between Thigpen and Lloyd. Campbell further testified that Fred Weatherspoon and Antonio House, two other individuals who made incriminating statements and were charged and convicted of participating in the victims' murders, were not involved. See *People v. House*, 2021 IL 125124, ¶ 5; *People v. Weatherspoon*, 2011 IL App (1st) 090681-U. Campbell claimed that, although he remained a member of the Vice Lords gang until 2016, he never discussed the crimes with anyone and did not learn that anyone had been charged with the crimes until 2009. Later, Campbell stated that it was 2006 when he learned that defendant and Thigpen had been arrested for the murders. Campbell was impeached with his convictions, his use of aliases, and his false statements to investigators. The State introduced Campbell's videorecorded prison interview, the guilty plea transcript, and certified copies of Campbell's convictions.

¶ 30    The trial court denied the petition on September 20, 2019. The court noted that it had "listened carefully to the evidence presented in this case. I have reviewed voluminous pleadings and exhibits, affidavits, disks, the transcript, and the record of the trial which [defendant] was found guilty of the murders of Mr. Purham and Mr. Burch." The court commented on the evidence at trial, noting that the trial testimony from Williams was "at odds with" previous statements he gave in which he stated that defendant "was one of the persons who surrounded Mr. Purham and Mr. Burch, got them into this car and took them to this area by the railroad tracks and at the time he did so, [defendant] had a gun." The court also commented that defendant's statement "was to the effect that *** [defendant] had a gun. He was involved in the

exportation of Mr. Burch and Mr. Purham from this street corner to this area where they were found, and [defendant] purportedly admitted to [assistant State's Attorney] Nelson he shot at one of those persons perhaps striking one of them in the leg." The court acknowledged that defendant claimed at trial that his statement had been coerced. The court further explained that the State's evidence "did not solely rest" on the statements from Williams and defendant, but that it was also corroborated by the "recovery of this nine millimeter handgun" on defendant at the time of his arrest. The court stated that there was "no absolute certainty *** that that gun was one of the murder weapons. But there was testimony that one of the bullets actually found in the clothing of one of the victims, a fired bullet, could have been fired from the gun found in connection with the arrest of [defendant]."

¶ 31 The court then considered the affidavit of Hills, but noted that Hills did not testify, and that the affidavit, while notarized, was undated. The court stated that it was "difficult to put a lot of reliance on the affidavit in light of the absence of Mr. Hills from this courtroom and any opportunity that the parties have to test the efficacy of his claims by virtue of his appearance here in court."

¶ 32 Turning to Campbell's testimony, the court noted that the police did not "cross paths with" Campbell until "January 2009, 16 years after the murders of Mr. Purham and Mr. Burch" and after he made inculpatory statements. The court then commented:

> "I listened carefully to Mr. Campbell's testimony. The plain fact of the matter ***
> I do not believe him. I do not find him to be a credible witness. I do not find that
> his testimony is so conclusive that it raises any reasonable probability that the
> result on any retrial would be different. *** For those reasons, *** I'm
> respectfully denying the petition."

¶ 33    Defendant filed a timely notice of appeal on October 4, 2019. In this court, defendant argues that the trial court's denial of his postconviction petition was manifestly erroneous. Defendant contends that Campbell's testimony that he was responsible for the offenses, and that defendant was not present, satisfied the requirements of establishing an actual innocence claim.

¶ 34    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a criminal defendant with a mechanism under which he can argue that his or her sentence and conviction were the result of a substantial denial of his constitutional rights under the United States Constitution, Illinois Constitution, or both. *People v. English*, 2013 IL 112890, ¶ 21. A postconviction proceeding is not an appeal from the judgment, but rather, it is a collateral attack on the trial court proceedings. *Id.* To receive postconviction relief, a defendant must show a substantial deprivation of his federal or state constitutional rights in the trial court proceedings, which produced the challenged judgment. *Id*.

¶ 35    A postconviction proceeding operates in three stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). If a defendant's postconviction petition survives the first stage, the proceedings advance to a second stage where counsel is appointed and granted leave to amend the petition into an appropriate legal form. *People v. Turner*, 187 Ill. 2d 406, 416-17 (1999). Then, if the petition makes a substantial showing of a constitutional violation, the matter advances to the third stage, which is an evidentiary hearing to determine the validity of the petition's factual allegations. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). This appeal arises following such a third stage hearing.

¶ 36    At the third stage, unlike the earlier ones, the petition's allegations are not presumed true; a petitioner must prove his allegations by a preponderance of the evidence. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132. The circuit court, as the finder of fact at the hearing, makes

19

credibility determinations and weighs the evidence. *People v. Reed*, 2020 IL 124940, ¶ 51. As a reviewing court, we will not reverse a trial court's decisions regarding credibility determinations or fact-finding after a third-stage evidentiary hearing unless it is manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473; *English*, 2013 IL 112890, ¶ 23. Manifest error is error so plain and indisputable that the opposite conclusion is clearly evident. *People v. Coleman*, 2013 IL 113307, ¶ 98. This deferential standard of review reflects the understanding that the circuit court is in the best position to observe and weigh the credibility of the witnesses. *People v. Coleman*, 183 Ill. 2d 366, 384–85 (1998).

¶ 37     Here, defendant raised a claim of actual innocence. A claim of actual innocence warrants a new trial if it is supported by evidence that is: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). New evidence means it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the defendant's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009). All three prongs of the test for actual innocence must be satisfied, and a defendant's failure to establish a single prong is fatal to an actual innocence claim. See *People v. Sanders*, 2016 IL 118123, ¶ 47.

¶ 38     Here, the circuit court dismissed defendant's postconviction petition after it concluded that Campbell's testimony was not so conclusive that it would probably change the result on

retrial. The conclusive character of the new evidence is "the most important element of an actual innocence claim." *People v. Robinson*, 2020 IL 123849, ¶ 47. The evidence need not be completely dispositive, and the ultimate question is whether the newly discovered evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶¶ 48, 61. This analysis necessarily involves viewing the old and new evidence together. *Id.* ¶ 48. In short, "[p]robability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*.

¶ 39 Defendant contends that the circuit court reached its decision by applying the incorrect standard for examining the conclusiveness element. Defendant asserts that the court "applied a total exoneration standard instead of considering whether Campbell's testimony put the trial evidence in a different light and undermined the court's confidence in the judgment of guilt."

¶ 40 The only specific statement of the circuit court on which defendant bases his contention is the following:

> "[T]here was no absolute certainty *** that that gun [found on defendant] was one of the murder weapons. But there was testimony that one of the bullets actually found in the clothing of one of the victims, a fired bullet, could have been fired from the gun found in connection with the arrest of [defendant]."

¶ 41 The court's comment on the trial evidence showing that a firearm found on defendant was consistent with, but not conclusively established to be, one of the murder weapons, is a proper comment on the strength of the trial evidence; it does not establish that the court used the wrong standard in examining his actual innocence claim. Instead, our review of the record reveals that the court applied the correct standard, concluding that Campbell's testimony was not

"so conclusive that it raises any reasonable probability that the result on any retrial would be different." The circuit court's holding was a proper recitation of the conclusiveness prong (see *id.*, ¶ 47 (evidence must be "of such conclusive character that it would probably change the result on retrial")), and we find nothing in the record to support defendant's contention that the court applied the wrong standard.

¶ 42    As stated above, it was for the circuit court to determine issues of credibility and resolve evidentiary conflicts. See *Reed*, 2020 IL 124940, ¶ 51; *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68 ("Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court."). Absent manifest error, we will defer to the trial court's credibility determinations at the hearing. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31. The circuit court specifically found that Campbell's testimony was incredible. Our review of the record demonstrates no manifest error to second-guess or overturn the circuit court's conclusion.

¶ 43    Campbell's evidentiary hearing testimony that the offenses were committed by Campbell and two other men, not including defendant, must be considered alongside the evidence at trial. That evidence includes a written statement of defendant, implicating himself, Thigpen, and "eight other guys" in the kidnappings and murders of the victims. Defendant's statement was corroborated by Williams's statement and grand jury testimony, implicating Thigpen and approximately 10 other men, including defendant. These statements were further corroborated by physical evidence, namely the gun recovered from defendant at his arrest and the parties' stipulation that the bullet found in Burch's clothing could have been fired from that gun.

¶ 44 We also note that Campbell's testimony contradicts the proposed testimony of Clark, whose affidavit defendant also attached to his postconviction petition, but elected to not go forward on at the evidentiary hearing. Although Clark claims defendant was not one of the offenders, her affidavit is more consistent with the accounts previously given by defendant and Williams, and the evidence presented at trial, in that she describes Thigpen and a group of men as committing the offenses. Campbell, by contrast, claims that only he and only two other men committed the offenses, and that both defendant and Thigpen were not involved.

¶ 45 Based on the trial evidence and the court's assessment of Campbell's credibility, we do not find the trial court's decision to be manifestly erroneous. Having concluded that defendant failed to show the conclusiveness of Campbell's testimony, we need not analyze defendant's actual innocence claim under the remaining prongs. See *Sanders*, 2016 IL 118123, ¶ 47.

¶ 46 Defendant next contends that he is entitled to a remand for further proceedings and appointment of new postconviction counsel because his postconviction counsel provided unreasonable assistance by raising, and then "inexplicably abandoning," certain meritorious claims. Specifically, defendant asserts that postconviction counsel raised a claim in defendant's April 2009 amended petition that trial counsel was ineffective in failing to "present evidence" and argue "that [defendant] was not running from police" at the hearing on the suppression motion. Defendant asserts that postconviction counsel then abandoned that claim in his February 2012 amended petition, and that postconviction counsel's decision to do so was unreasonable. Defendant also contends that postconviction counsel was unreasonable in raising and then abandoning the argument that appellate counsel was also ineffective for "failing to raise this issue on appeal."

¶ 47    The sixth amendment right to counsel does not extend to postconviction petitioners; counsel is afforded in collateral proceedings under the Act only as a matter of legislative grace, if at all. *People v. Cotto*, 2016 IL 119006, ¶ 29 (citing *People v. Hardin*, 217 Ill. 2d 289, 299 (2005)). Consequently, criminal defendants seeking relief in postconviction proceedings have no constitutional right to counsel, effective or otherwise. Postconviction petitioners are entitled to only "the level of assistance required by the Act." *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). The required quantum of assistance has been judicially deemed to be a "reasonable level," a standard that is significantly lower than the one mandated at trial by our state and federal constitutions. *Pendleton*, 223 Ill. 2d at 472.

¶ 48    Commensurate with the lower reasonable assistance standard mandated in postconviction proceedings, Illinois Supreme Court Rule 651 (eff. July 1, 2017) limits the requisite duties of postconviction counsel. They are required only to certify that they have "consulted with petitioner by phone, mail, electronic means or in person," "examined the record" as needed to shape the defendant's *pro se* claims, and "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation" of those claims. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Postconviction counsel may create a rebuttable presumption that reasonable assistance was provided by filing a Rule 651 certificate. *Perkins*, 229 Ill. 2d at 42, 44.

¶ 49    Here, postconviction counsel filed a Rule 651 certificate, in which he stated that he had "consulted with defendant, both by legal visit and legal mail, to ascertain his contentions of deprivations of his constitutional rights," and that he "obtained and examined the record, trial transcript, and relevant documents." Postconviction counsel further stated: "Defendant and I concur that the First [*sic*] Amended Petition for Post-Conviction Relief, filed February 27, 2012, adequately states defendant's claims of deprivations of his constitutional rights." The filing of

that certificate, although not dispositive, gives rise to a rebuttable presumption that counsel provided reasonable assistance. See *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19 ("The filing of a Rule 651(c) certificate gives rise to a rebuttable presumption that post-conviction counsel provided reasonable assistance.").

¶ 50 Turning to defendant's contentions, we initially disagree with defendant's characterization that the claims allegedly "abandoned" by postconviction counsel were previously raised in his 2009 first amended petition. Instead, in the 2009 amended petition, postconviction counsel argued that trial counsel was ineffective "for failing to argue that running from an officer, which [defendant] vehemently denies he did, equates to probable cause to stop and arrest *** [and that] [c]ounsel on appeal was also ineffective in this regard." Presumably, that statement contains a typographical error, and counsel intended to argue that running from an officer *does not* equate to probable cause to stop and arrest. Nonetheless, this argument was actually made by counsel at the hearing on defendant's suppression motion when counsel argued: "He arrested [defendant] because he was running across the street. And if that is probable cause, Your Honor, then -- I do not believe it's probable cause, and I think that the gun and the statements should be suppressed." Similarly, appellate counsel did challenge the court's denial of defendant's motion to suppress on appeal, albeit on grounds of voluntariness. But regardless, the argument in the 2009 amended petition that running from an officer does not amount to probable cause, is distinct from the argument that defendant posits should have been raised—that trial counsel should have presented evidence and argued that defendant was not running at all, and that appellate counsel should have also raised the same issue on appeal.

¶ 51 In his reply brief, defendant acknowledges that postconviction counsel's framing of defendant's claim was "admittedly *** awkward." Defendant contends, however, that even if the

25

claim was not raised in the 2009 amended petition, postconviction counsel's failure to "properly shape the claim" still supports his contention that postconviction counsel was unreasonable.

¶ 52    The problem, however, is that defendant did not raise any claim in his *pro se* petitions that could be read as challenging regarding trial or appellate counsel's effectiveness in this regard. As the Supreme Court has repeatedly held, postconviction counsel's duty to provide reasonable assistance extends only to those claims that the petitioner himself raised in his *pro se* petition; counsel has no obligation to add new claims. *See Pendleton*, 223 Ill. 2d at 476 ("While postconviction counsel *** may raise additional issues if he or she so chooses, there is no obligation to do so."); *People v. Davis*, 156 Ill. 2d 149, 164 (1993) ("Post-conviction counsel is only required to investigate and properly present the *petitioner's* claims.") (emphasis in original); *People v. Vasquez*, 356 Ill. App. 3d 420, 425 (2005) ("the reasonable representation of postconviction counsel does not include the exploration, investigation and formulation of potential claims.") (citation and quotation marks omitted).

¶ 53    In his reply brief, defendant asserts that he did raise this claim in his 2002 petition. In that petition, defendant argued that the court abused its discretion in denying his motion to suppress because he was not committing any crime when he was arrested, and he was just "minding his own business." Defendant contends that his statement should have put postconviction counsel "on notice" that defendant was not running away, and that the stop was in violation of his Fourth Amendment rights. Defendant's complaint, however, was with the trial court's decision, and not any action or inaction of trial or appellate counsel. Because defendant's *pro se* petitions did not include any allegations that could be interpreted as a challenge to trial counsel's effectiveness in litigating his suppression motion, or appellate counsel's effectiveness in failing to raise the claim

on appeal, postconviction counsel had no obligation to litigate those unraised claims. See *Pendleton*, 223 Ill. 2d at 476; *Davis*, 156 Ill. 2d at 164; *Vasquez*, 356 Ill. App. 3d at 425.

¶ 54    We acknowledge, however, that, like here, a petitioner is often proceeding *pro se* in the initial filing of a postconviction petition. Accordingly, at the first stage of postconviction proceedings, a petition will be dismissed only if it is "frivolous or patently without merit," *i.e.*, where "the allegations in the petition, taken as true and liberally construed, fail to present the 'gist of a constitutional claim.' " *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). A *pro se* petitioner "need only present a limited amount of detail," and is not required to include "legal arguments or [citations] to legal authority." *People v. Gaultney,* 174 Ill. 2d 410, 418 (1996)). Even at the second stage of postconviction proceedings, we continue to liberally construe a petitioner's allegations, and "the dismissal of a post-conviction petition is warranted only when the petition's allegations of fact—liberally construed in favor of the petitioner and in light of the original trial record—fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *Coleman*, 183 Ill. 2d at 382.

¶ 55    Nonetheless, even if we were to liberally construe defendant's *pro se* petition itself, or in combination with the 2009 first amended petition, to conclude that defendant raised the claims he presents in this appeal, we would still conclude that defendant has not shown that postconviction counsel provided an unreasonable level of assistance by not raising, or "inexplicably abandoning" the claims. The record supports postconviction counsel's choice not to raise effectiveness challenges based on trial counsel's failure to "present evidence" and argue "that [defendant] was not running from police" at the hearing on the suppression motion.

¶ 56    Specifically, defendant contends that trial counsel performed deficiently by failing "to present [defendant] to testify" that he was not running from the police at the time of his arrest.

Defendant also alleges that trial counsel performed deficiently in failing to impeach Officer Norris with his arrest report, which stated that when the officer first saw defendant, he was "standing there and that he ran subsequently," and which did not indicate that the officer ordered defendant to stop.

¶ 57    To establish a claim of ineffective assistance of counsel, a defendant must demonstrate both (1) deficient performance, *i.e.*, that counsel's performance was objectively unreasonable under prevailing professional norms; and (2) prejudice, *i.e.*, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Downs*, 2015 IL 117934, ¶ 13; *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to satisfy either prong defeats the claim. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 58    To establish that his counsel performed deficiently, defendant must overcome the strong presumption that counsel's actions stemmed from sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). Effective assistance of counsel is competent, not perfect, representation. *People v. Vega*, 408 Ill. App. 3d 887, 889 (2011). Neither mistakes in strategy, nor the fact that another attorney with the benefit of hindsight would have handle a case differently, indicates that trial counsel was incompetent. *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010). Decisions regarding which evidence to present and which witnesses to call are matters of trial strategy (*People v. Williams*, 2017 IL App (1st) 152021, ¶ 38), and such decisions will not ordinarily support a claim of ineffective assistance of counsel (*Peterson*, 2017 IL 120331, ¶ 80). Counsel's decisions concerning the method and substance of his arguments during a suppression hearing are also matters of strategy and, consequently, not generally grounds for a claim of ineffectiveness. See *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988). Such strategic decisions

only rise to the level of ineffective assistance if they were so unsound that there was no meaningful adversarial testing. *People v. West*, 187 Ill. 2d 418, 433 (1999).

¶ 59    Similarly, advice to a defendant regarding whether to testify is a matter of trial strategy. Such advice will not constitute ineffective assistance of counsel absent evidence suggesting that counsel "refused to allow the defendant to testify." *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009). Here, defendant has made no claim that he informed trial counsel that he wanted to testify at the first suppression hearing, and trial counsel refused. Moreover, there is an obvious reason why trial counsel would have made a strategic choice not to present defendant's testimony at the first suppression hearing.  Specifically, since defendant later testified at trial, any discrepancies in his testimony at the first suppression hearing would have affected the credibility of his trial testimony. Accordingly, trial counsel may have chosen not to present defendant's testimony at the first suppression hearing, thereby limiting the impeachment evidence that would be available against him. See *People v. Sturgis*, 58 Ill. 2d 211, 216 (1974) ("The testimony of a defendant *** in conjunction with his motion to suppress evidence may not be introduced by the State directly in its case in chief but may be used for purposes of impeachment should the defendant choose to testify at trial."); *People v. Mulero*, 176 Ill. 2d 444, 465 (1997) (holding that "it was proper to impeach defendant with her prior inconsistent testimony from the suppression hearing.").

¶ 60    In these circumstances, and given the risks involved in having defendant testify, it was reasonable for counsel to make a strategic decision to argue, as he did, that even if Officer Norris observed defendant running, such flight did not amount to probable cause to arrest him.

¶ 61    Decisions on cross-examination and impeachment of witnesses are also matters of trial strategy that are generally immune to claims of ineffective assistance of counsel. *People v.*

*Pecoraro*, 175 Ill. 2d 294, 326 (1997). The manner in which counsel cross-examines a particular witness involves the exercise of professional judgment, and is entitled to substantial deference from a reviewing court. *Id.* at 326-27. A defendant can only prevail on a claim of ineffective assistance of counsel by showing that counsel's approach to the cross-examination was objectively unreasonable. *Id.* at 327.

¶ 62    We find the inconsistencies between the arrest report and Officer Norris's testimony of which defendant complains to be relatively minor. Further, Officer Norris was cross-examined about the arrest report in his trial testimony, and he explained that the notation in the arrest report that defendant was "standing there" before running, was a mistake; and that the arrest report did not include that he told defendant to stop, because it was only one-page long, and included only a "brief synopsis or summary of the incidents or facts surrounding the arrest." Given the relatively minor nature of those inconsistencies, and trial counsel's reasonable strategy to argue at the suppression hearing that running does not establish probable cause, defendant cannot overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

¶ 63    Finally, defendant contends that appellate counsel was ineffective for filing to "raise the trial court's error [in denying the motion to suppress evidence based upon unlawful arrest] and trial counsel's ineffectiveness on appeal."

¶ 64    Claims of ineffective assistance of appellate counsel are considered using the same standard as those alleging ineffective assistance of trial counsel. *Childress*, 191 Ill. 2d at 175. To establish that appellate counsel was ineffective, defendant must show both that appellate counsel's performance was deficient and that appellate counsel's error was prejudicial. People v. Robinson, 217 Ill.2d 43, 47 (2005).

¶ 65　A defendant alleging that appellate counsel was ineffective must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner. *People v. West*, 187 Ill. 2d 418, 435 (1999). If the underlying issue is not meritorious, the defendant did not suffer prejudice from counsel's failure to raise it on direct appeal. *Id.*

¶ 66　Appellate counsel is not obligated to raise every conceivable contention of error but may exercise professional judgment in selecting from the many potential claims that might be raised on appeal. *English*, 2013 IL 112890, ¶ 33; *People v. Simms*, 192 Ill. 2d 348, 362 (2000). If appellate counsel determines that certain issues have no merit, appellate counsel is not incompetent from refraining to raise those issues. *Id.* However, if appellate counsel's appraisal of the merits of an issue or issues is clearly wrong, then the question of counsel's competence is at issue. *Id.* On review, we construe appellate counsel's decisions on issues raised on appeal with substantial deference. *People v. Borizov*, 2019 IL App (2d) 170004, ¶ 14. We also must examine the merits of the underlying issue because a defendant is not prejudiced by appellate counsel's failure to raise an issue that is without merit. *Simms*, 192 Ill. 2d at 362.

¶ 67　As we previously concluded that defendant has not established ineffective assistance of trial counsel, we may quickly dispose of defendant's argument that appellate counsel was ineffective for failing to raise "trial counsel's ineffectiveness on appeal." Because defendant's claim of ineffective assistance of trial counsel is nonmeritorious, it necessarily follows that appellate counsel was not ineffective for failing to raise the issue of trial counsel's ineffectiveness on appeal. See *People v. Rogers*, 197 Ill. 2d 216, 222 (2001).

¶ 68　We next turn to defendant's argument that appellate counsel was ineffective for failing to challenge the trial court's denial of the motion to suppress evidence based upon his allegedly "unlawful arrest." Underlying defendant's ineffectiveness argument is his contention that his

arrest was unlawful. Defendant contends that Norris lacked probable cause to search him because no officer testified that they saw defendant with Williams or "doing anything giving rise to probable cause or reasonable suspicion." Defendant also contends that the search was not reasonable under *Terry v. Ohio*, 392 U.S. 1 (1968), because the officers did not specifically identify defendant as being "with the group of people with Williams at the funeral."

¶ 69 As the trial court held at the suppression hearing, the evidence showed that, through information provided by a reliable confidential informant, the officers had knowledge that Williams, the leader of a faction of the Unknown Vice Lords, would be attending the funeral with several armed individuals. The officers conducted surveillance, during which officers saw ten to fifteen men, including Williams, wearing black hooded sweatshirts enter and leave the funeral home together. While defendant was not specifically identified as being a part of the group with Williams at the funeral, the officers testified that during their surveillance, they were unable to recognize many of the individuals with Williams because the men were wearing black hooded sweatshirts with the hoods up. After other officers moved in to approach part of the group of individuals who had been seen with Williams, Officer Norris saw defendant running toward Officer Norris, and away from the other officers. Defendant was wearing clothing consistent with what was observed on the group of men with Williams. The trial court found that at that point, Officer Norris "acted reasonably in ordering the defendant to stop." Defendant, however, fled into an alley and hid behind a dumpster. The court further found that Officer Norris had "reasonable suspicion to pursue his investigation" further, and that he was reasonable in conducting a protective pat-down search based on a reasonable belief that defendant "may be armed and dangerous." Pursuant to that search, Officer Norris found a .9 millimeter weapon in the defendant's waistband, which had the words "Vice Lords" scratched into the wooden handle.

The court concluded that based on "the totality of the circumstances *** the officers acted reasonably."

¶ 70    In these circumstances, it was as reasonable for Officer Norris to believe that defendant was part of the group of men who had been observed with Williams, and Officer Norris's pat down for weapons fits within the framework of *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* instructs that a police officer may stop and detain a person without probable cause to investigate possible criminal activity if the officer can point to specific, articulable facts, which, taken together with rational inferences, reasonably warrant the intrusion. *Id.* at 21; see also *People v. Colyar*, 2013 IL 111835, ¶ 45 (when an officer has a reasonable suspicion that an individual may be armed and dangerous, the officer may take necessary measures to determine whether the person is armed and to neutralize any threat of physical harm). As the *Terry* court concluded:

> "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.

¶ 71    The *Terry* court further admonished that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

¶ 72    Reviewing the actions of Officer Norris under an objective standard, a reasonably cautious individual in a similar situation could reasonably suspect that defendant was armed and dangerous, implicating officer safety and the safety of others. See *Colyar*, 2013 IL 111835, ¶ 43. Thus, under the totality of the circumstances, Officer Norris was justified in conducting a *Terry* pat down, and an appellate challenge to the denial of defendant's motion to suppress based on an unlawful arrest would not have been meritorious. Accordingly, appellate counsel's decision not to raise such a challenge was not objectively unreasonable decision, nor would there be a reasonable probability of a different outcome had the issue been raised. In these circumstances, postconviction counsel was not unreasonable in failing to raise a challenge to appellate counsel's effectiveness in his amended postconviction petition.

¶ 73    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 74    Affirmed.